**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No.** |
| **JOHN J. WOODS, LIVINGSTON GROUP ASSET MANAGEMENT COMPANY d/b/a SOUTHPORT CAPITAL, and HORIZON PRIVATE EQUITY, III, LLC,** | |
| **Defendants.** | |

## <u>COMPLAINT</u>

Plaintiff, the United States Securities and Exchange Commission

("Commission" or "SEC"), alleges the following:

## I.  OVERVIEW

1.     John Woods has been running a massive Ponzi scheme for over a decade.  As of the end of July 2021, investors in the Ponzi scheme were owed over $110,000,000 in principal.  There are more than 400 investors, residing in at least 20 different states, who currently hold investments in the Ponzi scheme, which goes by the name Horizon Private Equity, III, LLC ("Horizon").  Many of the victims are elderly retirees who were preyed upon by investment advisers at Livingston Group Asset Management Company d/b/a Southport Capital ("Southport"), a registered investment adviser firm owned and controlled by Woods.  The Defendants' Ponzi scheme is ongoing and continues to raise money from new investors each month.

2.     Woods and other investment adviser representatives at Southport told clients that they would receive returns of 6-7% interest, guaranteed for two to three years, for non-specific investments in a fund called "Horizon Private Equity."  Woods and his cohorts at Southport generally told investors that Horizon would earn a return by investing their money in, for example, government bonds, stocks, or small real estate projects; investors were not told that their money would or could be used to pay returns to earlier investors.  But that is exactly what the

Defendants did—they were only able to pay the guaranteed returns to existing investors by raising and using new investor money.  Horizon has not earned any significant profits from legitimate investments; instead a very large percentage of purported "returns" to earlier investors were simply paid out of new investor money.

3.      The assets owned by Woods and the entities under his control, including Southport and Horizon, are worth far too little for there to be any realistic prospect that the Ponzi scheme will be able to pay back existing investors their principal, let alone the promised returns.  Investors trusted Woods and the Southport investment advisers working at his direction, and they stand to lose significant portions of their retirement savings when the Ponzi scheme inevitably collapses.  The longer the scheme continues, the larger the losses will be for those left holding the bag.

4.      Defendant Southport, which is registered with the SEC as Livingston Group Asset Management Company, Inc., has more than $824,000,000 in client assets under management.  As the President and majority owner of the firm, Woods has extensively used Southport's offices and employees to carry out his Ponzi scheme.  Given his fraudulent conduct, and Southport's role in the fraud,

Woods cannot be allowed to remain in charge of a firm with such a significant sum of client assets under management.

5.      Horizon is an entity that Woods used strictly for the purpose of raising money from investors in the Ponzi scheme.  Horizon has no offices or employees of its own; all of its activities have been conducted by Woods and Southport employees.  At all times relevant to this case, Woods had actual control over Horizon's assets and operations, and ultimate control over the use and disposition of investor funds.  Because the scheme has been going on for so long, and because Woods, Southport, and Horizon did not use any of the typical record-keeping practices one would expect from a legitimate investment fund, millions of dollars' worth of investor funds are currently unaccounted for.

6.      Emergency relief is important in this case.  Woods and Horizon, through Southport's investment advisers, raised in excess of $600,000 per month in new investments during the most recent months for which the Commission has been able to obtain bank records.  The Commission believes that additional victims are being defrauded on a daily basis.  Given the scope and duration of this Ponzi scheme, an asset freeze and a receiver are necessary to gather, preserve and

protect whatever assets still exist for the benefit of the victims of the Defendants'
Ponzi scheme.

## II.  VIOLATIONS

7.     The Defendants have engaged in acts or practices, or aided and
abetted, and, unless restrained and enjoined by this Court, will continue to
engage in acts and practices that constitute and will constitute or will aid, abet
and cause violations of Sections 17(a)(1), 17(a)(2), and 17(a)(3) of the
Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77q(a)(1), 77q(a)(2),
and 77q(a)(3)].

8.     The Defendants have engaged in acts or practices, or aided and
abetted, and, unless restrained and enjoined by this Court, will continue to
engage in acts and practices that constitute and will constitute, or will aid, abet
and cause violations of Section 10(b) of the Securities Exchange Act of 1934
("Exchange Act") [15 U.S.C. § 78j(b)] and subsections (a), (b), and (c) of Rule
10b-5 thereunder [17 C.F.R. § 240.10b-5(a), (b), and (c)].

9.     The Defendants have engaged in acts or practices, or aided and
abetted, and, unless restrained and enjoined by this Court, will continue to
engage in acts and practices that constitute and will constitute or will aid, abet

and cause violations of Sections 206(1), 206(2) and 206(4) of the Investment

Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-6(1), 80b-6(2), 80b-

6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 206(4)-8].

### III.  JURISDICTION AND VENUE

10.     The Commission brings this action pursuant to Sections 20 and 22 of

the Securities Act [15 U.S.C. §§ 77t and 77v]; Sections 21(d) and 21(e) of the

Exchange Act [15 U.S.C. §§ 78u(d) and 78u(e)]; and Sections 209 and 214 of the

Advisers Act [15 U.S.C. §§ 80b-9 and 80b-14] to enjoin Defendants from

engaging in the transactions, acts, practices, and courses of business alleged in this

complaint, and transactions, acts, practices, and courses of business of similar

purport and object, for disgorgement plus prejudgment interest, for civil penalties,

and for other equitable relief.

11.     This Court has jurisdiction over this action pursuant to Section 22 of

the Securities Act [15 U.S.C. § 77v]; Sections 21(d), 21(e), and 27 of the

Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa]; Section 214 of the

Advisers Act [15 U.S.C. § 80b-14(a)], and 28 U.S.C. § 1331.

12.     Defendants, directly and indirectly, made use of the mails, and the means and instrumentalities of interstate commerce in connection with the transactions, acts, practices, and courses of business alleged in this complaint.

13.     Certain of the transactions, acts, practices, and courses of business constituting violations of the Securities Act, the Exchange Act and the Advisers Act occurred in the Northern District of Georgia.  In addition, defendant Woods resides in this judicial district, defendant Southport maintains an office located in this judicial district, defendant Horizon's principal place of business is located in this judicial district, and certain investors in Horizon reside in this judicial district.

14.     Defendants, unless restrained and enjoined by this Court, will continue to engage in the transactions, acts, practices, and courses of business alleged in this complaint, and in transactions, acts, practices, and courses of business of similar purport and object.

## IV.  THE DEFENDANTS

15.   **John J. Woods**, age 56, is a resident of Marietta, Georgia.  Woods has been the majority owner and in control of the operations of Livingston, which does business as Southport, since approximately 2008.  From 2008 to

2018, Woods concealed his ownership of and control over Southport because, during that time, he was a registered representative at an institutional, dually-registered broker dealer and investment adviser firm ("the Institutional Investment Adviser") that was unaware of his involvement with Southport. Woods has been in the securities industry since at least 1989, and he has passed the Series 7, Series 63 and Series 65 securities licensing examinations.

16.    **Livingston Group Asset Management Company, Inc. d/b/a Southport Capital ("Southport")** is a Delaware corporation with its principal place of business in Chattanooga, Tennessee.  Southport is an SEC-registered investment adviser with reported assets under management of $824 million. John Woods is the President and majority owner of Southport.

17.    **Horizon Private Equity, III, LLC ("Horizon")** is a Georgia limited liability company with its principal place of business in Atlanta, Georgia that was formed in 2007 with John Woods as the company's registered agent. Horizon, which is not registered with the Commission, is the vehicle through which the Ponzi scheme has raised more than $100 million from investors. Woods is an authorized signatory on the bank accounts of Horizon into which

investor funds were deposited, and he ultimately controlled the use and disposition of those funds.

## V.   THE FRAUDULENT SCHEME

### A. *John Woods Buys Southport in 2008 and Starts a Ponzi Scheme.*

18.     In 2008, Woods was a registered investment adviser representative of the Institutional Investment Adviser.  He was also a registered representative of the broker-dealer business of the Institutional Investment Adviser, which held dual broker dealer and investment adviser registrations with the Commission.  As part of his employment with the Institutional Investment Adviser, Woods was required to disclose any outside business activities in which he was engaged.  The rules requiring disclosure of outside business activities are designed to, among other things, protect investors from conflicts of interest and to allow firms to monitor and detect any inappropriate activity that could adversely affect their customers.

19.     By at least 2008, Woods was soliciting investments for Horizon, which was nominally controlled by Woods's accountant (the "Accountant") at that point in time.  As of July 2021, Horizon is still making interest payments to several investors who first put money in the scheme in 2008.  The Accountant's

involvement appears to have been a sham to avoid detection of Woods's undisclosed outside business activities by the Institutional Investment Adviser and the SEC.

20.     When soliciting investments, Woods told investors that the investment was very safe, would pay a fixed rate of return, and that investors could get their principal back without penalty subject to a 30- or 90-day waiting period.

21.     In 2008, Woods also purchased Southport, an SEC-registered investment adviser, from its owners, a wealthy family in Chattanooga, Tennessee.  Woods did not disclose his ownership of Southport to the Institutional Investment Adviser at that time, nor did he disclose any interest in or relationship with Horizon.  It is unclear at this time whether Woods used investor money to purchase Southport.

22.     Shortly after Woods purchased Southport, his brother ("the Brother"), who was also a registered investment adviser representative of the Institutional Investment Adviser, left the Institutional Investment Adviser and nominally became in charge of Southport.  In fact, Woods was in charge behind the scenes the entire time the Brother was the Chief Investment Manager of

Southport.  Woods and the Brother continued to solicit investments in Horizon

from Southport clients and from customers of the Institutional Investment

Adviser the entire time Woods was employed by the Institutional Investment

Adviser.

23.    Woods told the Institutional Investment Adviser that Southport,

through his Brother, had recommended that his customers invest in Horizon,

and he disclaimed any financial or other interest in Horizon or Southport when

asked.  The Brother did, in fact, solicit Southport clients to invest in Horizon,

but during the early stages of the Ponzi scheme many investors were referred

through the Institutional Investment Adviser.

24.    In 2010, Woods's cousin ("the Cousin"), who was also a registered

investment adviser representative of the Institutional Investment Adviser, left

the Institutional Investment Adviser and went to work for Southport.  The

Cousin recommended to Southport clients that they invest in Horizon.  Like

Woods, the Cousin told investors that the investment was very safe, would pay

a guaranteed rate of return, and that clients could get their principal back

without penalty.  In later years, the Cousin would act as the de facto sales

manager for Horizon, and he received hundreds of thousands of dollars per year in compensation from Horizon.

25.     In 2016, the Institutional Investment Adviser became concerned that Woods was involved in an undisclosed outside business activity, as described in more detail below, and it ultimately asked Woods to resign.

26.     Woods began working full time at Southport, but he did not disclose to the SEC his involvement as a Southport owner and CEO until approximately December 2018.  Woods also did not disclose his affiliation with Horizon to the SEC, and in fact, as alleged in more detail below, he actively took steps to conceal the existence, ownership and activities of Horizon from the Commission.

**B. Woods and Other Southport Advisers Make Material Misrepresentations to Horizon Investors.**

27.     Most investors were not given any written materials setting forth the terms of their Horizon investments.  Instead, they relied on oral descriptions of the investment provided by Woods, the Brother, the Cousin and other Southport investment advisers.

28.     Because of the large number of investors, the length of time during which the Ponzi scheme has operated, and the lack of written disclosures to investors, the Commission doubts that it has identified every misrepresentation made to investors.  Nevertheless, at a minimum, each of the following material misrepresentations was made to at least one investor by Woods or another investment adviser at Southport:

a.  That returns to Horizon investors would be paid from profits of Horizon's investments;

b.  That Horizon investments had a guaranteed rate of return;

c.  That Horizon investments carried little risk and were extremely safe and conservative;

d.  That there was no possibility of losing the principal investment in Horizon;

e.  That Southport employees would not receive compensation for recommending Horizon investments;

f.  That Horizon was not affiliated with Southport;

g.  That the Horizon investment was an annuity;

h.  That there were no fees or costs associated with the Horizon
    investment;

i.  That Horizon would use the proceeds of investments to purchase
    government bonds that would be held to maturity;

j.  That Horizon would use the proceeds of investments to purchase
    collateralized mortgage obligations;

k.  That the risk of loss of a Horizon investment was minimal because
    Horizon had a very diversified investment portfolio; and

l.  That the Horizon investment was sponsored or offered by the
    Institutional Investment Adviser.

29.  Each of the statements set forth above is false and misleading.

30.  Woods and the other investment advisers at Southport did not tell
investors in Horizon—most if not all of whom were clients to whom they owed
a fiduciary duty—that investor funds would or could be used to make payments
to earlier investors, either for the payment of interest or for the return of
principal.

### C.  Southport Induces Clients to Participate in the Ponzi Scheme.

31.     As President and majority owner of Southport, Woods used Southport as a vehicle to find investors to funnel to his Ponzi scheme.  The Brother and the Cousin were heavily involved in recruiting investors for Horizon while they were employed by and minority owners of Southport.  In fact, of the four individuals listed as owners of Southport on its annual disclosure, only one of them (who owns approximately 11% of Southport) may not have been involved in Southport's facilitation of the Horizon Ponzi scheme.

32.     As a registered investment adviser, Southport and its individual employees owed their clients a fiduciary duty to act in their clients' best interest and to disclose any conflicts of interest to their clients.

33.     Woods and Southport's investment advisers cultivated relationships of trust with Southport's clients.  Many Horizon investors had long-standing relationships with their individual adviser before being pitched the Horizon investment.  These investors felt comfortable investing in Horizon in large part because of the trust they placed in their individual investment advisers at Southport.

34.     Southport's advisers often convinced their clients to sell or redeem existing investments, and to invest the proceeds in Southport.  For instance,

numerous investors were encouraged to terminate annuities early and to invest

the proceeds in Horizon.  As an inducement to several such investors, Southport

advisers promised that Southport or Horizon would pay for any early

redemption penalties on behalf of the investor.

35.     The individual advisers who convinced their clients to invest in

Horizon received significant compensation from Horizon in addition to their

normal Southport compensation.  For instance, the Cousin received nearly

$600,000 from Horizon between January 1, 2019 and May 28, 2021, and

another Southport investment adviser representative received more than

$400,000 from Horizon during that same period.

36.     Since at least 2015, Southport administrative employees assisted

Horizon investors with setting up accounts at an independent custodial trust

company (the "Trust Company") when they wanted to make a Horizon

investment.  The employees would fill out all of the necessary paperwork,

provide the paperwork to the investor for signature, and then assist with the

transfer of funds from the investor to the Trust Company.  The Trust Company

would then send the funds on to Horizon's bank account.

37.     The Cousin paid all of the fees of the Trust Company on behalf of Southport clients who invested in Horizon, using a credit card in the name of Horizon for which he was an authorized user.  Since 2015, those fees have totaled over $500,000.  It is unclear at this point what funds were used to pay the credit card bills.

38.     When it first established a relationship with the Trust Company in 2015, Woods and Southport directed the Trust Company to deposit new investor funds to bank accounts in the name of Horizon.

39.     Several Southport employees (in addition to Woods, the Brother and the Cousin) directly solicited their Southport clients to make investments in Horizon.  Still other Southport employees set up meetings for their clients with the Cousin so that he could pitch the Horizon investment.  A number of these Southport employees received compensation directly from Horizon, which was noted as "payroll" in Horizon's bank records.

40.     Many Horizon investors were pitched the Horizon investment in person at Southport offices.  In other instances, Southport investment advisers went to their clients' homes to pitch the Horizon investment.

41.     Monthly statements for Horizon investments were generated and sent to investors by Southport administrative employees.

42.     Southport administrative employees kept track of the outstanding liability to Horizon investors and the interest that was due to each investor.

43.     Each month, Woods would obtain from Southport administrative personnel spreadsheets showing the amount each Horizon investor was owed in interest.  Woods would then email spreadsheets to the Trust Company showing the amount of interest that should be credited to each investor account.

44.     Woods also caused bank accounts in the name of Horizon (the same accounts to which new investor funds were deposited by the Trust Company) to transfer lump sums to the Trust Company for deposit into investor accounts, consistent with the instructions in the spreadsheets.  Woods would send one wire transfer and one spreadsheet for retirement accounts, and another wire transfer and spreadsheet for non-qualified custodial accounts.

45.     Substantial portions of the funds that Woods caused to be transferred to make interest payments to Horizon investors came from new investor money.

**D.     *The Ponzi Scheme is Massive and Ongoing.***

46.     Because of the length of time Woods has been running the Ponzi scheme, the Commission has not yet fully determined the scope of the fraud. Nevertheless, the Commission has analyzed in detail investments and transactions from January 1, 2019, through the present.  Those analyses show that the Ponzi scheme is massive and ongoing.

47.     Between January 1, 2019, and the present, Horizon used accounts at Bank of America and IBERIABANK (the "Horizon Accounts") to receive money from and send money to Horizon investors.  As of January 1, 2019, the Horizon accounts had a combined balance of approximately $47,777.

48.     From January 1, 2019 to May 28, 2021, Horizon received approximately $49 million in deposits in the Horizon Accounts.  Of that amount, more than $40 million was deposited by the Trust Company and represented new investor money.  In other words, only approximately $9 million was deposited in the Horizon Accounts from sources other than investors.

49.     During that same period, Horizon withdrew or transferred approximately $48 million from the Horizon Accounts.  Of that amount, more

than $21 million was sent to the Trust Company for interest payments and returns of investor capital.

50.     Without the $40 million in new investor money, Horizon would not have had enough money for the $21 million in interest payments and returns of investor capital that it made during the period from January 1, 2019, through May 28, 2021.

51.     Of the deposits that came into the Horizon Accounts from sources other than new investors, very few represented profits from investments. Instead, large sums of money (that largely cancel each other out) flowed to and from various real estate projects in which Woods arranged for Horizon to invest.  Several of those large, round-trip transfers represented up-front loans made by Horizon for real estate projects that were repaid once the project obtained traditional financing.

52.     The records for the period also reflect millions of dollars in payments sent to and received from an insurance brokerage company of which Woods is the majority owner; nearly $170,000 in payments for a credit card in John Woods's name; more than $500,000 of "telephone transfer debits;" and more than $300,000 of non-descript "checking withdrawals."

53.    The pattern described above holds true when looking at specific months—interest and principal payments were necessarily funded with new investor money.  For example, on April 1, 2021, Horizon's IBERIABANK account had a balance of $684,024.  That amount includes $250,000 deposited from an investor on March 31, 2021, $100,000 deposited from an investor on March 29, 2021, and $50,000 from two other investors that same day.  In other words, at least $400,000 of the money in Horizon's bank account at the beginning of April 2021 was new investor money.

54.    During April 2021, the Trust Company deposited $1,377,200 in new investor funds in the IBERIABANK account.  That amount represents 99% of the funds deposited into the account during that month.

55.    Also during the month of April 2021, Horizon transferred $725,335 from the IBERIABANK account to the Trust Company for payments to existing investors.

56.    Without the deposits of new investor money referred to above, Horizon would not have had enough money to make interest payments to investors in April 2021.

57.     The Commission staff has spoken with several of the Southport clients who made investments at the end of March or in April 2021, and none of them were told that their investment proceeds would or could be used to make interest payments to existing investors.  Moreover, several of those investors said they would not have invested if they thought that their money would be used for that purpose.

58.     As of the end of July 2021, Horizon owed investors more than $110 million in principal.  As of May 27, 2021, Horizon owed investors approximately $109 million, meaning that Horizon's outstanding liability to investors grew by more than $1 million in just two months.  Woods and Southport raised money from new Horizon investors as recently as July 2021. Those investors believe that they can get their money back at any time, with 30- or 90-days' notice.

59.     As of the end of July 2021, Horizon had liquid assets worth less than $16 million.  The majority of the other Horizon assets of which the Commission is aware are fractional ownership interests in small real estate projects in various stages of development.  The Commission estimates that

Horizon has invested less than $20 million in those projects, and liquidating them will be complicated, time consuming, and yield uncertain amounts.

## VI.  WOODS'S EFFORTS TO COVER UP THE SCHEME

### A.    *Woods Lies to the Institutional Investment Adviser.*

60.    In 2014, Southport purchased an investment adviser and insurance brokerage business from its founder (the "Founder").  At the time the sale was negotiated, Woods was still an employee of the Institutional Investment Adviser, but he nevertheless led the negotiations with the Founder.  The sale agreement called for an initial down payment, with the remainder of the purchase to be funded in periodic payments pursuant to a promissory note.

61.    After the sale of the business, Woods, the Brother and the Cousin recruited the Founder to solicit investments for Horizon.

62.    The Founder was skeptical of the Horizon investment opportunity because of the lack of written disclosures typical of what he was familiar with from his experience in the securities industry.  The Founder ultimately refused to solicit client investments in Horizon.  Around the same time, Southport stopped paying the Founder under the terms of the promissory note, so the Founder filed suit against Southport, Woods and Horizon in two separate

lawsuits.   Those lawsuits were ultimately settled, and the Founder was paid in full for his business.

63.     In or around 2015, in part because of the Founder's lawsuit, the Institutional Investment Adviser became suspicious that Woods was affiliated with Southport or Horizon.  A significant number of the Institutional Investment Adviser's customers had invested in Horizon at that time.  Woods denied that he had any relationship with Southport or Horizon when asked by the Institutional Investment Adviser's compliance personnel.

64.     Several months after the lawsuits with the Founder were settled, Woods called the Founder and asked him not to speak to the Institutional Investment Adviser's compliance personnel.  Woods told the Founder that he was in danger of losing his job and that he had only months to live because he was suffering from cancer.  The Founder does not believe he ever spoke with the Institutional Investment Adviser's compliance team.

**B.    *Woods Lies to the SEC During a Regulatory Examination of Southport.***

65.     The Commission's Division of Examinations conducts the agency's National Exam Program.  Among other things, the Division of

Examinations conducts on-site examinations of SEC-registered investment advisers.

66.     One of the issues the staff of the Division of Examinations considers when conducting an examination is whether there are any undisclosed outside business activities that could indicate an undisclosed conflict of interest. The presence of undisclosed outside business activities creates the risk that individuals working at an investment adviser may be recommending investments based on their own undisclosed self-interest rather than the interests of their clients.

67.     In 2018, the Division of Examinations conducted an examination of Southport.  Woods was one of the Division of Examinations' primary points of contact at Southport.

68.     One of the issues that the Examinations staff discussed with Woods during the 2018 examination was the relationship among him and Southport and Horizon.

69.      Woods failed to disclose accurately his involvement in and control over Horizon to the SEC's Examinations staff.  In fact, Woods minimized his

role in Horizon, as elaborated below, even though he maintained control over the entity.

70.     As part of the 2018 examination, the SEC staff asked Woods a series of specific questions, in writing.  Southport's Chief Compliance Officer emailed Woods's response to those questions to the SEC.  Some of the specific questions and answers are set forth below.

71.     The SEC staff asked Woods, "Did you (John Woods) control the operations of Horizon . . . anytime during July 2008 to now?"  In response, John Woods wrote "No. Never."

72.     The SEC staff asked Woods, "Did you have access to bank accounts (e.g., ability to withdraw money, pay bills, write checks, etc.) of Horizon . . . anytime from January 1, 2014 to now?"  In response, Woods wrote, "No. I'm not a signor on . . . HPE III checking Accounts."

73.     The SEC staff asked Woods, "List all investors in Horizon III during 1/1/2014 to 3/31/2018."  In response, Woods wrote, "I'm an investor in this fund, but not a manager.  I don't have all this information."

74.     The SEC staff asked Woods to provide a copy of "Offering documents of Horizon . . . including LLC agreements (operating agreements),

PPMs, and subscription agreements including amendments during 1/1/2014 to 3/31/2018." In response, Woods wrote, "No PPM, but can ask for Operation Agreement."

75.    The SEC staff asked Woods for a "[l]ist of <u>all</u> bank and brokerage accounts of Horizon . . . during January 1, 2014 to current." In response, Woods wrote, "I'm investor but not Manager. Not a signor. Not any additional Brokerage Accounts. I believe Iberia Bank and BOA."

76.    Woods's responses set forth above were knowingly false.

77.    In 2021, the SEC Examinations staff conducted another examination of Southport.

78.    During the 2021 examination, Woods and Southport again misleadingly downplayed their relationship with Horizon.

## **COUNT I – FRAUD**

### **Violations of Section 17(a)(1) of the Securities Act**
### **[15 U.S.C. § 77q(a)(1)]**
(All Defendants)

79.    Paragraphs 1 through 78 are hereby realleged and incorporated herein by reference.

80.     Between in or around 2008 and the present, the Defendants, in the offer and sale of the securities described herein, by the use of means and instruments of transportation and communication in interstate commerce and by use of the mails, directly and indirectly, employed devices, schemes and artifices to defraud purchasers of such securities, all as more particularly described above.

81.     The Defendants knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud.

82.     While engaging in the course of conduct described above, the Defendants acted with scienter, that is, with an intent to deceive, manipulate or defraud or with a severe reckless disregard for the truth.

83.     By reason of the foregoing, the Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## **<u>COUNT II – FRAUD</u>**

### **Violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act**
### **[15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)]**
(All Defendants)

84.     Paragraphs 1 through 78 are hereby realleged and incorporated herein by reference.

-28-

85.     Between in or around 2008 and the present, the Defendants, acting knowingly, recklessly, or negligently in the offer and sale of the securities described herein, by use of means and instruments of transportation and communication in interstate commerce and by use of the mails, directly and indirectly:

a.     obtained money and property by means of untrue statements of material fact and omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

b.     engaged in transactions, practices and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities; all as more particularly described above.

86.     By reason of the foregoing, Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)].

## COUNT III – FRAUD

**Violations of Section 10(b) of the Exchange Act**
**[15 U.S.C. § 78j(b)] and Subsections (a), (b), and (c) of Rule 10b-5**
**thereunder [17 C.F.R. § 240.10b-5 (a), (b), and (c)]**

**(All Defendants)**

87.    Paragraphs 1 through 78 are hereby re-alleged and are incorporated herein by reference.

88.    Between in or around 2008 and the present, Defendants, in connection with the purchase and sale of securities described herein, by the use of the means and instrumentalities of interstate commerce and by use of the mails, directly and indirectly:

   a.    employed devices, schemes, and artifices to defraud;

   b.    made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

   c.    engaged in acts, practices, and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities; all as more particularly described above.

89.    Defendants knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud, made untrue statements of material facts and omitted to state material facts, and engaged in fraudulent acts, practices and courses of business.  In engaging in such conduct,

Defendants acted with scienter, that is, with an intent to deceive, manipulate or defraud or with a severe reckless disregard for the truth.

90.     By reason of the foregoing, Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Subsections (a), (b), and (c) of Rule 10b-5 thereunder [17 C.F.R. §§ 240.10b-5(a), (b), and (c)].

## COUNT IV – FRAUD

**Violations of Sections 206(1) of the Advisers Act
[15 U.S.C. § 80b-6(1)]
(Defendants Woods and Southport)**

91.     Paragraphs 1 through 78 are hereby realleged and are incorporated herein by reference.

92.     From at least 2008 through the present, Defendants Woods and Southport (the "Adviser Defendants"), acting as investment advisers, using the mails and the means and instrumentalities of interstate commerce, directly and indirectly, employed devices, schemes and artifices to defraud one or more advisory clients and/or prospective clients.

93.     The Adviser Defendants knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud.  In

engaging in such conduct, the Adviser Defendants acted with scienter, that is, with

intent to deceive, manipulate or defraud or with a severe reckless disregard for the

truth.

94.     By reason of the foregoing, the Adviser Defendants, directly and

indirectly, have violated, and, unless enjoined, will continue to violate Section

206(1) of the Advisers Act [15 U.S.C. § 80b-6(1)].

## COUNT V – FRAUD

### Violations of Section 206(2) of the Advisers Act
### [15 U.S.C. § 80b-6(2)]
### (Defendants Woods and Southport)

95.     Paragraphs 1 through 78 are hereby realleged and are incorporated

herein by reference.

96.     From at least 2008 through the present, the Adviser Defendants,

acting as investment advisers, by the use of the mails and the means and

instrumentalities of interstate commerce, directly and indirectly, engaged in

transactions, practices, and courses of business which would and did operate as a

fraud and deceit on one or more advisory clients and/or prospective clients.

97.     By reason of the foregoing, the Adviser Defendants, directly and

indirectly, have violated and, unless enjoined, will continue to violate Section

206(2) of the Advisers Act [15 U.S.C. § 80b-6(2)].

## COUNT VI – FRAUD

**Violations of Section 206(4) of the Advisers Act
and Rule 206(4)-8 thereunder [15 U.S.C. § 80b-6(4) & 17 C.F.R.
§ 206(4)-8]
(Defendants Woods and Southport)**

98.      Paragraphs 1 through 78 are hereby realleged and are incorporated

herein by reference.

99. From at least 2008 through the present, the Adviser Defendants, in

connection with the purchase and sale of pooled investment vehicles described

herein:

a.      made untrue statements of material facts and/or omitted to state

material facts necessary to make the statements made, in the light of the

circumstances under which they were made, not misleading; and

b.      engaged in acts, practices, and courses of business that were

fraudulent, deceptive, and/or manipulative, all as more particularly described

above.

100.   By reason of the foregoing, the Adviser Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

## COUNT VII – AIDING and ABETTING

101.   Paragraphs 1 through 90 are hereby restated and incorporated herein by reference.

102.   Each Defendant substantially assisted the violations of the other Defendants set forth in Counts I, II, and III above.

103.   Each Defendant knew they were participating in securities law violations when assisting and engaging in transactions with the other Defendants.

104.   Each Defendant aided and abetted the violations in Counts I, II, and III above.

## COUNT VIII – AIDING and ABETTING

105.   Paragraphs 1 through 78 and 91 through 97 are hereby restated and incorporated herein by reference.

106.   Each Defendant substantially assisted the violations of the Adviser Defendants set forth in Counts IV and V above.

107.   Each Defendant knew they were participating in securities law violations when assisting and engaging in transactions with the Adviser Defendants.

108.   Each Defendant aided and abetted caused the violations in Counts IV and V above.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully prays for:

## I.

A temporary restraining order and preliminary and permanent injunctions enjoining the Defendants, their officers, agents, servants, employees, and attorneys from violating, directly or indirectly, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; Sections 17(a)(1), 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1), (a)(2), (a)(3)]; and Sections 206(1), 206(2) and 206(4) of the Advisers Act [15 U.S.C. §§ 80b-6(1), 80b-6(2) and 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

## II.

An order requiring an accounting by Defendants of the amounts raised and the use of proceeds from the fraudulent conduct described in this Complaint and the disgorgement by Defendants of all ill-gotten gains or unjust enrichment with prejudgment interest, to effect the remedial purposes of the federal securities laws.

## III.

An order pursuant to Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)] imposing civil penalties against Defendants.

## IV.

An order freezing the assets of Defendants pending further order of the Court.

## V.

An order preventing Defendants from destroying or concealing documents until further order of this Court.

**VI.**

The appointment of a receiver to take charge of Woods, Southport, Horizon and their affiliates to preserve the value of the Defendants' remaining assets for the benefit of the Defendants' victims.

**VII.**

Such other and further relief as this Court may deem just, equitable, and appropriate in connection with the enforcement of the federal securities laws and for the protection of investors.

**JURY TRIAL DEMAND**

The Commission hereby demands a trial by jury as to all issues that may be so tried.

This 20th day of August, 2021.

Respectfully submitted,


M. Graham Loomis
Regional Trial Counsel
Georgia Bar No. 457868
loomism@sec.gov

/s/Joshua A. Mayes
Joshua A. Mayes
Senior Trial Counsel

-37-

Georgia Bar No. 143107
mayesj@sec.gov

Harry B. Roback
Senior Trial Counsel
Georgia Bar No. 706790
robackh@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
950 East Paces Ferry Road, NE, Suite 900
Atlanta, GA 30326
Tel: (404) 842-7600
Facsimile: (404) 842-7679