# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# (ATLANTA DIVISION)

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>JOHN J. WOODS, *et al.*,<br><br>Defendants. | Civil Action No. _____ |

# MEMORANDUM IN SUPPORT OF
# PLAINTIFF SEC'S MOTION FOR A TEMPORARY
# RESTRAINING ORDER AND OTHER EMERGENCY RELIEF

**INTRODUCTION**

The Securities and Exchange Commission ("SEC") seeks emergency relief to stop a $100 million Ponzi scheme being run by Defendants John J. Woods ("Woods") and Southport Capital ("Southport"), an investment advisory firm that Woods owns and controls.  For the past decade, Woods and other investment adviser representatives at Southport have falsely told investors that they will earn guaranteed returns by investing in Defendant Horizon Private Equity, III, LLC ("Horizon III").  In reality, Horizon III was also owned and controlled by Woods, the company generated little revenue or profits, and the returns paid to existing investors largely came from new investor money.  As of July 2021, there are more than 400 investors in Horizon III, residing in over 20 states, who are owed $110 million in principal, far exceeding Horizon III's existing assets.  Many of the investors in Horizon III are elderly retirees who were preyed upon by Woods and other investment advisers at Southport.

Emergency relief is necessary to stop this ongoing Ponzi scheme and to prevent the dissipation of assets.  Woods and Horizon III, through Southport's investment advisers, have been raising more than $600,000 per month in new investments, and without immediate relief there is significant risk of additional victims being defrauded.  Accordingly, the SEC respectfully asks that the Court

enter a temporary restraining order; an order freezing the assets of Defendants; an order appointing a receiver over Defendants; and an order expediting discovery, preventing the destruction of documents, and requiring an accounting.

**FACTS**

**I.      THE DEFENDANTS' FRAUDULENT SCHEME**

**A.      Woods Buys Southport in 2008 and Starts a Ponzi Scheme**

Woods resides in Marietta, Georgia.  Since 2008, he has been the majority owner and in control of the operations of Livingston Group Asset Management Company, Inc., which does business as Southport Capital.  Southport is an SEC-registered investment adviser with reported assets under management of $824 million.  (Mitchell Decl. ¶ 5, Ex. 1 at 18.)  Southport maintains an office in Atlanta, Georgia.  (Goldstein Decl. ¶ 3.)

From 2008-2016, Woods hid his ownership of and control over Southport because, during that time, he was also a registered representative at an institutional, dually-registered broker dealer and investment adviser firm ("the Institutional Investment Adviser") that was unaware of his involvement with Southport. (Mitchell Decl. ¶¶ 6-7, Ex 3.)  SEC rules require investment adviser representatives to disclose outside business activities so that registered investment advisers can monitor potential conflicts of interest, but Woods failed to do so.

-2-

Woods and Southport also have never disclosed that Woods owned and controlled Horizon III, which has its principal place of business in Atlanta, Georgia.  (Mitchell Decl. ¶¶ 5, 7, Exs. 2, 3.)  Woods is an authorized signatory on the bank accounts of Horizon III into which investor funds in the company are deposited, and he ultimately controls the use and disposition of those funds. (Kunkle Decl. ¶ 5, Ex. 1; Campbell Decl. ¶ 12, Exs. G-H.)

By at least 2008, Woods was soliciting investments in Horizon III, which by that time was nominally controlled by his accountant.  (Goldstein Decl. ¶ 11, Ex. A.)  When soliciting investments in Horizon III, Woods told investors that the investment was very safe, would pay a fixed rate of return, and that investors could get their principal back without penalty.  (Gorman Decl. ¶¶ 5-8.)  As of July 2021, Horizon III is still making interest payments to investors who first put money in the company in 2008.  (Goldstein Decl. Ex. A; Campbell Decl. Ex. C.)

Shortly after Woods purchased Southport, his brother ("the Brother"), who was also a registered investment adviser representative of the Institutional Investment Adviser, left that firm to run Southport.  (Mitchell Decl. ¶ 8, Ex. 4.) Woods remained in charge, however, behind the scenes.  (Himmler Decl. ¶ 3; Goldstein Decl. ¶ 17, Ex. I.)

In 2010, Woods's cousin ("the Cousin"), who was also a registered investment adviser representative of the Institutional Investment Adviser, left the firm and went to work for Southport.  (Mitchell Decl. ¶ 9, Ex. 5.)  The Cousin recommended to Southport clients that they invest in Horizon III.  (Gorman Decl. ¶ 5; Lyle Dec. ¶¶ 2-3.)  Like Woods, the Cousin told investors that the investment was very safe, would pay a guaranteed rate of return, and that clients could get their principal back without penalty.  (*Id.*)

### B.     Woods and Southport Operate the Ponzi Scheme for a Decade

As the President and majority owner of Southport, Woods has used Southport as a vehicle to find investors for his Ponzi scheme.  (Gorman Decl. ¶¶ 5-7; Goldstein Decl. ¶¶ 4-11; Himmler Decl. ¶¶ 4-7.)  The Brother and the Cousin also hold minority ownership stakes in Southport, and they were heavily involved in recruiting investors for Horizon III while they were employed by and owners of Southport.  (Mitchell Decl., Ex. 1 at 29.)  In fact, of the four individuals listed as owners of Southport on its annual disclosure, only one of them (who owns approximately 11% of Southport) may not have been involved in Southport's facilitation of the Horizon Ponzi scheme.  (*Id.*)

As a registered investment adviser, Southport and its individual investment adviser representatives owed their clients a fiduciary duty to act in their clients'

best interest.  (Gorman Decl. ¶ 5.)  Woods and Southport's investment advisers cultivated relationships of trust with Southport's clients, many of whom had long-standing relationships with their individual adviser before being pitched the Horizon investment.  (Worley Decl. ¶ 3; Lyle Decl. ¶ 3)  These investors felt comfortable investing in Horizon III in large part because of the trust they placed in their individual investment advisers at Southport.  (Worley Decl. ¶ 3.)

Their trust was misplaced.  Most investors were not given any written materials describing the terms of their Horizon III investments.  (Monnett Decl. ¶ 8; D. Goad Decl. ¶ 8.)  Instead, they relied on oral descriptions of the investment provided by Woods, the Brother, the Cousin, and other Southport investment advisers.  (Gorman Decl. ¶¶ 3-5; Lyle Decl. ¶¶ 3-5; Peele Decl. ¶¶ 3-7; D. Goad Decl. ¶¶ 2-4.)  Because of the large number of investors, the length of time during which the Ponzi scheme has operated, and the lack of written disclosures, the SEC doubts that it has identified every misrepresentation made to investors.

Nevertheless, at a minimum, each of the following material misrepresentations was made to at least one investor by Woods or another investment adviser at Southport:  (i) that Horizon III investments had a guaranteed rate of return and carried little risk; (ii) that Horizon III was not affiliated with Southport; (iii) that Southport employees would not receive compensation for

recommending Horizon III investments; (iv) that Horizon III was not affiliated with Woods; (v) that the Horizon III investment was an annuity; (vi) that there were no fees or costs associated with the Horizon III investment; (vii) that Horizon III would use the proceeds of investments to purchase government bonds that would be held to maturity; and (viii) that the risk of loss of a Horizon III investment was minimal because Horizon had a diversified investment portfolio. (Lyle Decl. ¶¶ 3-7; Monnett Decl. ¶¶ 3-5; Gorman Decl. ¶¶ 6-8; S. Goad Decl. ¶¶ 3-6; Peele Decl. ¶¶ 3-9.)  In addition, Woods and the other advisers at Southport did not tell investors in Horizon III that investor funds would or could be used to make payments to earlier investors, either for the payment of interest or for the return of principal.  (*Id.*)

The individual advisers who convinced their clients to invest in Horizon III received significant compensation from Horizon III in addition to their normal Southport compensation.  (Kunkle Decl. ¶ 14.)  For instance, the Cousin received nearly $600,000 from Horizon III between January 1, 2019 and May 28, 2021, and another Southport investment adviser representative received more than $400,000 from Horizon III during that same period.  (*Id*.)

Moreover, Southport administrative employees assisted Horizon III investors with setting up accounts at an independent custodial trust company (the

"Trust Company") when they wanted to make a Horizon III investment.  (Lyle Decl. ¶ 5.) The employees would fill out all of the necessary paperwork, provide the paperwork to the investor for signature, and then assist with the transfer of funds from the investor to the Trust Company.  (*Id.*)  The Trust Company would then send the funds to Horizon III's bank account.  (Campbell Decl. ¶ 16; Lyle Decl. ¶ 5; Worley Decl. ¶ 6.)

Several Southport employees (in addition to Woods, the Brother and the Cousin) directly solicited their Southport clients to make investments in Horizon III.  (Worley Decl. ¶ 3; D. Goad Decl. ¶ 3; Lyle Decl. ¶ 3; Peele Decl. ¶ 3.)  Still other Southport employees set up meetings for their clients with the Cousin so that he could pitch them the Horizon III investment, including at Southport's offices.  (Worley Decl. ¶ 3; Lyle Decl. ¶ 3.)  A number of these Southport employees received compensation directly from Horizon III, which was noted as "payroll" in Horizon's bank records.  (Kunkle Decl. ¶ 14.)

Southport administrative employees also kept track of the outstanding liability to Horizon III investors and the interest that was due to each investor.  (Goldstein Decl. ¶¶ 4-11, 18, Exs. A, J.)  Each month, Woods would obtain from Southport administrative personnel spreadsheets showing the amount each Horizon III investor was owed in interest.  (Goldstein Decl. ¶ 18, Ex. J.)  Woods would then

email spreadsheets to the Trust Company showing the amount of interest that

should be credited to each investor account.  (Campbell Decl. ¶¶ 12-13, Exs. G, H.)

 Woods also caused bank accounts in the name of Horizon III to transfer lump

sums to the Trust Company for deposit into investor accounts pursuant to the

instructions in the spreadsheets.  (Campbell Decl. ¶ 12.)  Substantial portions of the

funds that Woods caused to be transferred to make interest payments to Horizon III

investors came from new investor money.  (Kunkle Decl. ¶¶ 13, 21.)

### C.    The Ponzi Scheme is Massive and Ongoing

Because of the length of time Woods has been running the Ponzi scheme, the

SEC has not yet fully determined the scope of the fraud.  Nevertheless, financial

records from January 1, 2019 through the present show that the Ponzi scheme is

massive and ongoing.  Between January 1, 2019 and the present, Horizon III used

accounts at Bank of America and IBERIABANK (the "Horizon Accounts") to

receive money from and send money to Horizon III investors.  (Kunkle Decl. ¶ 3.)

As of January 1, 2019, the Horizon Accounts had a combined balance of

approximately $47,777.  (*Id.* ¶ 6.)  From January 1, 2019 to May 28, 2021, Horizon

III received approximately $49 million in deposits in the Horizon Accounts.  (*Id.*

¶ 7.)  Of that amount, more than $40 million was deposited by the Trust Company

and represented new investor money.  (*Id.* ¶ 8.)

-8-

During that same period, Horizon III withdrew or transferred approximately $48 million from the Horizon Accounts.  (*Id.* ¶ 10.)  Of that amount, more than $21 million was sent to the Trust Company for interest payments and returns of investor capital.  (*Id*. ¶¶ 11-12.)  Without the $40 million in new investor money, Horizon III would not have had enough money for the $21 million in interest payments and returns of investor capital that it made during the period from January 1, 2019 through May 28, 2021.  (*Id.* ¶ 13.)

The pattern described above holds true when looking at specific months— interest and principal payments were necessarily funded with new investor money.  (*Id.* Ex. 2.)  On April 1, 2021, for example, Horizon III's IBERIABANK account had a balance of $684,024.  (*Id.* ¶ 18.)  That amount includes $250,000 deposited from an investor on March 31, 2021, $118,400 deposited from an investor on March 29, 2021, and $50,000 from two other investors that same day.  (*Id.*)  In other words, at least $400,000 of the money in Horizon III's bank account at the beginning of April 2021 was new investor money.  (*Id.*)

During April 2021, the Trust Company deposited $1,377,200 in new investor funds in the IBERIABANK account.  (*Id.* ¶ 19.)  That amount represents 99% of the funds deposited into the account during that month.  (*Id.*)  Also during the month of April 2021, Horizon III transferred $725,335 from the IBERIABANK

-9-

account to the Trust Company for payments to existing investors.  (*Id.* ¶ 20.)
Without the deposits of new investor money referred to above, Horizon III would
not have had enough money to make interest payments to investors in April 2021.
(*Id.* ¶ 21.)  The Commission staff has spoken with several of the Southport clients
who made investments at the end of March or in April 2021, and none of them was
told that their investment proceeds would or could be used to make interest
payments to existing investors.  (*See, e.g.*, Lyle Decl. ¶ 7; Peele Decl. ¶ 9.)

    As of the end of July 2021, Horizon III owed investors more than $110
million in principal.  (Campbell Decl. ¶ 8, Ex. C.)  Those investors believe that
they can get their money back at any time, with 30 or 90 days' notice.  (*e.g.*,
Monnett Decl. ¶ 4; Peele Decl. ¶ 6.)  As of the end of July 2021, Horizon III had
liquid assets worth less than $16 million.  (Mitchell Decl. ¶ 12.)  The majority of
the other Horizon III assets of which the Commission is aware are fractional
ownership interests in small real estate projects in various stages of development.
(*Id.* ¶¶ 13-14.)  The SEC estimates that Horizon III has invested less than $20
million in those projects, and liquidating them will be complicated, time
consuming, and yield uncertain amounts. (*Id.* ¶ 14.)

    As of May 27, 2021, Horizon III owed investors approximately $109
million, meaning that Horizon III's outstanding liability to investors grew by more

than $1 million in just two months.  (Campbell Decl. ¶¶ 7-8.)  Woods and

Southport raised money from new Horizon III investors as recently as July 13,

2021.  (S. Goad Decl. ¶ 2; Campbell Decl. ¶¶ 6, 9, Ex. C.)

## II.        DEFENDANTS COVER UP THE FRAUDULENT SCHEME

### A.        Woods Fails to Disclose His Relationship with Southport

In 2014, Southport purchased an investment adviser and insurance brokerage

business from its founder (the "Founder").  (Himmler Decl. ¶ 3.)  At the time of the

sale, Woods was still an employee of the Institutional Investment Adviser, but he

nevertheless led the negotiations with the Founder.  (*Id.*)

After the sale of the business, Woods, the Brother, and the Cousin recruited

the Founder to solicit investments for Horizon III.  (*Id.* ¶ 5.)  The Founder was

skeptical of the Horizon investment because of the lack of written disclosures

typical of what he was familiar with in the securities industry.  (*Id.* ¶¶ 5-8.)  The

Founder ultimately refused to solicit investments in Horizon III.  (*Id.*)

Around 2015, in part because the Founder had filed two lawsuits against

Woods, Southport, and Horizon III, the Institutional Investment Adviser became

suspicious that Woods was affiliated with Southport or Horizon III.  (*Id.* ¶¶ 8-9.)

Woods denied that he had any relationship with Southport or Horizon III when

asked by the Institutional Investment Adviser's compliance personnel.  (*Id.*)

-11-

Woods also asked the Founder not to speak to the Institutional Investment Adviser's compliance personnel.  (*Id.*)  Southport and Woods did not disclose Woods's affiliation with Southport until 2018 at the earliest, despite Woods having bought the majority ownership interest in 2008.  (Mitchell Decl. ¶¶ 7, 10, Exs. 3, 6.)  Woods and Southport have never disclosed any relationship with Horizon III to the SEC.  (Mitchell Decl. ¶ 5, Ex. 2 at 15-16 (listing Southport's other affiliations).)

### B.   Woods Lies to the SEC During a Regulatory Examination of Southport

In 2018, the Commission's Division of Examinations conducted an on-site examination of Southport.  (Han Decl. ¶¶ 3-5.)  Woods was one of the SEC's Examinations staff's primary points of contact at Southport.  (*Id.* ¶ 6.)  Among other issues, the SEC's Examinations staff discussed with Woods his relationship with Southport and Horizon III.  (*Id.* ¶ 7.)  Woods did not provide the SEC's Examinations staff with accurate information, including in his responses to a series of specific written questions concerning Horizon III.  (*Id.* ¶ 8, Ex. 3.1.)

Southport's Chief Compliance Officer emailed Woods's written responses to the SEC.  (*Id.* Ex. 6.)  Some of the specific questions and answers include:

- The SEC staff asked Woods, "Did you (John Woods) control the operations of Horizon . . . anytime during July 2008 to now?"  In response, Woods wrote "No. Never."  (*Id.* Ex. 3.1 (Q.37), Ex. 6.1 (A.37).)

- The SEC staff asked Woods, "Did you have access to bank accounts (e.g., ability to withdraw money, pay bills, write checks, etc.) of Horizon . . . anytime from January 1, 2014 to now?"  In response, Woods wrote, "No. I'm not a signor on . . . HPE III checking Accounts."  (*Id.* Ex. 3.1 (Q.38), Ex. 6.1 (A.38).)

- The SEC staff asked Woods, "List <u>all</u> investors in Horizon III during 1/1/2014 to 3/31/2018."  In response, Woods wrote, "I'm an investor in this fund, but not a manager.  I don't have all this information."  (*Id.* Ex. 3.1 (Q.49), Ex. 6.1 (A.49).)

These and other responses by Woods were false.  (*Id.*; Goldstein Decl. ¶¶ 11, 15-17, Exs. A, G, H, I; Kunkle Decl. ¶ 5, Ex. 1.)

## ARGUMENT

### I.    The Defendants Committed Securities Fraud

Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder prohibit fraudulent conduct in connection with the purchase or sale of securities while using the instrumentalities of interstate commerce.  *See* 15

-13-

U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5; *Lorenzo v. S.E.C.*, 139 S. Ct. 1094, 1100-01 (2019); *S.E.C. v. Merchant Capital, LLC*, 483 F.3d 747, 773 n.17 (11th Cir. 2007). To prevail on these claims, the SEC must show:  (1) a misstatement or omission; (2) that was material; (3) made with scienter; and (4) in connection with the purchase or sale of securities.  *S.E.C. v. Monterosso*, 756 F.3d 1326, 1333-34 (11th Cir. 2014).

Section 17(a) of the Securities Act of 1933 ("Securities Act") prohibits fraudulent conduct in the offer or sale of securities.  15 U.S.C. § 77q(a); *Monterosso*, 756 F.3d at 1334.  Section 17(a)(1) has nearly identical elements as Section 10(b), and "requires substantially similar proof."  *Monterosso*, 756 F.3d at 1334.  Section 17(a)(2) and Section 17(a)(3) have similar elements as well, but the SEC only has to show that the defendants acted negligently.  *Merchant Capital*, 483 F.3d at 766.

## A.    The Investments in Horizon III Are Securities

"Congress' purpose in enacting the securities laws was to regulate investments, in whatever form they are made and by whatever name they are called."  *S.E.C. v. Edwards*, 540 U.S. 389, 393 (2004).  "To that end, [Congress] enacted a broad definition of 'security,' sufficient to encompass virtually any instrument that might be sold as an investment."  *Id.*; *Reves v. Ernst & Young*, 494 U.S. 56, 61 (1990).

The investments in Horizon III are "securities" because they qualify as an "investment contract" under Section 2(a)(1) of the Securities Act and Section 3(a)(10)

of the Exchange Act.  *See* 15 U.S.C. § 77b(a)(1), § 78c(a)(10).  An investment

contract exists if there is (1) an investment of money, (2) in a common enterprise, (3)

with a reasonable expectation of profits to be derived from the entrepreneurial or

managerial efforts of others.  *S.E.C. v. W. J. Howey Co.*, 328 U.S. 293, 298-99

(1946); *S.E.C. v. ETS Payphones*, *Inc.*, 408 F.3d 727, 731 (11th Cir. 2005).

In this case, the Horizon III investments meet all three elements of *Howey*.  The

first element is satisfied because investors put their money in Horizon III based on the

promised rate of return.  *Id.*  The second element is also met because, under "the

concept of vertical commonality, . . . a common enterprise exists where the fortunes

of the investor are interwoven with and dependent on the efforts and success of those

seeking the investment or of third parties."  *S.E.C. v. Unique Fin. Concepts, Inc.*, 196

F. 3d 1195, 1199 (11th Cir. 1999).  Finally, the third element is met because

management and control over investor funds were vested exclusively in Defendants.

Investors simply had no role in how the Defendants utilized their funds.  *Id*.

## B.   Defendants Made Material Misrepresentations and Engaged in an Overall Scheme to Defraud Horizon III Investors

The Securities Act and Exchange Act prohibit both "false statements" and

"omissions of material fact necessary in order to make the statements made, in the

light of the circumstances under which they were made, not misleading."  *FindWhat*

-15-

*Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1305 (11th Cir. 2011); *In re K-tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 898 (8th Cir. 2002). "A statement or omission is 'misleading' if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *S.E.C. v. Strategic Global Inv., Inc.*, 262 F. Supp.3d 1007, 1016 (S.D. Cal. 2017).

In this case, the Defendants repeatedly made false and misleading statements to investors. They fraudulently touted Horizon III as a safe and dependable investment, when in fact the company generated little revenue. In addition, the returns that investors purportedly earned on their investment in Horizon III were actually the proceeds from other investors, something that the Defendants failed to disclose. These are precisely the type of false and misleading statements that the federal securities laws prohibit. *See, e.g.*, *S.E.C. v. Zandford*, 535 U.S. 813, 821-22 (2002).

The misstatements were also material. *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (information is material if it would significantly alter the total mix of information available to investors); *Merchant Capital*, 483 F.3d at 766 (same). Defendants' misrepresentations went to the very nature of the investment, including how investor proceeds would be used and returns would be generated. Courts have consistently found that such statements—going to the core of the investment decision—are material. *See, e.g.*, *S.E.C. v. Smart*, 678 F.3d 850, 857 (10th Cir. 2012).

-16-

The securities laws also reach beyond false statements and encompass any wrongdoing that rises to the level of a scheme or deceptive practice. *Superintendent of Insurance v. Bankers Life & Casualty Co.*, 404 U.S. 6, 10 (1971). "To be liable for a scheme to defraud, a defendant must have 'committed a manipulative or deceptive act in furtherance of the scheme.'" *S.E.C. v. Blockvest, LLC*, 2018 WL 4955837, at *5 (S.D. Cal. 2018) (quoting *Cooper v. Pickett*, 137 F.3d 616, 624 (9th Cir. 1997)).

Numerous courts have concluded that a Ponzi scheme is an inherently deceptive scheme and practice under the securities laws. *See, e.g.*, *United States v. Silvestri*, 409 F.3d 1311, 1317 n.6 (11th Cir. 2005) (noting that a Ponzi scheme is "a phony investment plan in which monies paid by later investors are used to pay artificially high returns to the initial investors"); *Janvey v. Alguire*, 647 F.3d 585, 597 (5th Cir. 2011) ("A Ponzi scheme is a fraudulent investment scheme in which money contributed by later investors generates artificially high dividends or returns for the original investors"). Thus, in addition to making material misstatements and omissions as described above, the Defendants also violated the securities laws simply by operating a Ponzi scheme, *i.e.*, paying purported returns to earlier investors using new investor money. *United States v. Moloney*, 287 F.3d 236, 242 (2d Cir. 2002), *abrogated on other grounds by U.S. v. Cotton*, 535 U.S. 625 (2002) ("A Ponzi scheme by definition uses the purportedly legitimate but actually fraudulently

-17-

obtained money to perpetuate the scheme . . . .").

### C.     Defendants Acted With Scienter

Scienter under Section 10(b), Rule 10b-5, and Section 17(a)(1) "refers to a mental state embracing an intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hoochfelder*, 425 U.S. 185, 193 n. 12 (1976).  "Scienter may be established by a showing of knowing misconduct or severe recklessness." *S.E.C. v. Carriba Air, Inc.*, 681 F.2d 1318, 1324 (11th Cir. 1982).  Woods's scienter is imputed to the corporate defendants under his control.  *S.E.C. v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1087 n.1 (2d Cir. 1972).  For its Section 17(a)(2) and 17(a)(3) claims, the SEC need only show negligence.  *Merchant Capital,* 483 F.3d at 766.

In this case, the Defendants knowingly and repeatedly made false statements to investors.  Among other misrepresentations, the Defendants told investors that their funds would be invested in bonds or other projects with minimal risk.  The Defendants knew that these—and many other—statements were untrue.  In reality, the Defendants knowingly perpetrated an egregious fraud against these investors by running a Ponzi scheme.  Scienter is further demonstrated by Woods's efforts to conceal the scheme by blatantly lying to the SEC about his involvement with Horizon III.  As a result, there is ample evidence that the Defendants acted with the requisite scienter.  *Monterosso*, 756 F.3d at 1335; *Merchant Capital,* 483 F.3d at 766.

-18-

## II.     The Defendants Committed Investment Adviser Fraud

Sections 206(1), 206(2), and 206(4) of the Investment Advisers Act of 1940 ("Advisers Act") prohibit investment advisers from defrauding any client or prospective client. *See* 15 U.S.C. §§ 80b-6(1), (2), (4). The provisions cover essentially the same fraudulent or manipulative conduct proscribed in Section 10(b) and Section 17(a), when done by investment advisers.[1] *See, e.g.*, *S.E.C. v. Haligiannis*, 470 F. Supp. 2d 373, 383 (S.D.N.Y. 2007). The Advisers Act also imposes fiduciary duties on investment advisers, including the duty to act in good faith and to disclose all material facts to clients and investors in funds they manage. *S.E.C. v. Capital Gains Bureau*, 375 U.S. 180, 191-94 (1963). Scienter is required under Section 206(1), while negligence is sufficient under Sections 206(2) and 206(4). *ZPR Inv. Mgmt., Inc. v. S.E.C.*, 861 F.3d 1239, 1247 (11th Cir. 2017). As explained above, Woods and Southport defrauded multiple clients over many years through the fraudulent Horizon III Ponzi scheme. In doing so, they violated Sections 206(1), 206(2), and 206(4) of the Advisers Act.

---

[1] Southport Capital and Woods both meet the broad statutory definition of an investment adviser. *See* 15 U.S.C. § 80b-2(a)(11); *U.S. v. Elliott*, 62 F.3d 1304, 1309–10 (11th Cir. 1995); *U.S. v. Miller*, 833 F.3d 274, 282 (3d Cir. 2016).

### III.   The Court Should Grant Emergency Relief

### A.   Temporary Restraining Order

Under Section 20(b) of the Securities Act, Section 21(d) of the Exchange Act,

and Section 209(d) of the Advisers Act, the Court should enter a "temporary

injunction or restraining order" if the Commission makes "a proper showing" that

"there is a reasonable likelihood that the defendant is engaged or about to engage in

practices that violate the federal securities laws." *S.E.C. v. First Fin. Group of Tex.*,

645 F.2d 429, 434 (5th Cir. 1981); 15 U.S.C. §§ 77t(b), 78u(d), 80b-9(d).

When determining the likelihood of future violations, courts examine the

totality of the circumstances. *S.E.C. v. Zale Corp.*, 650 F.2d 718, 720 (5th Cir. 1981).

These circumstances include, among other things, the egregiousness of the violations,

the isolated or repeated nature of the violations, the degree of scienter involved, the

likelihood that the defendant's occupation will present opportunities for future

violations, and the defendant's age and health. *Carriba Air*, *Inc.*, 681 F.2d at 1322.[2]

Here, the Commission has presented substantial evidence that Defendants

knowingly and repeatedly violated the antifraud provisions of the federal securities

---

[2] Unlike private litigants, the Commission does not need to show irreparable injury, a balance of equities in its favor, or that remedies at law are unavailable. *Mgmt. Dynamics, Inc.*, 515 F.2d at 808; *Smith*, 653 F.3d at 127.

laws by running a Ponzi scheme over an extended period of time.  The Court should accordingly issue a temporary restraining order enjoining Woods, who is only 56 years old, Southport, and Horizon III from operating the Ponzi scheme.  *Id.*

## B.    Receiver

"The appointment of a receiver is a well-established equitable remedy available to the SEC in its civil enforcement proceedings for injunctive relief." *First Fin. Group*, 645 F.2d at 438; *S.E.C. v. Torchia*, 183 F. Supp. 3d 1291, 1322-23 (N.D. Ga. 2016).  A "district court's exercise of its equity power in this respect is particularly necessary in instances in which the corporate defendant, through its management, has defrauded members of the investing public; in such cases, it is likely that, in the absence of the appointment of a receiver to maintain the status quo, the corporate assets will be subject to diversion and waste to the detriment of those who were induced to invest in the corporate scheme and for whose benefit, in some measure, the SEC injunctive action was brought."  *Id.  See also S.E.C. v. Materia*, 745 F.2d 197, 200-01 (2d Cir. 1984).

Courts consider multiple factors when determining whether to appoint a receiver.  These factors include:  (1)  whether the plaintiff has a valid claim; (2) whether the defendant committed or might commit fraud; (3) whether the property is in imminent danger of being lost; (4) whether adequate legal remedies are available;

-21-

(5) whether any harm to the plaintiff by denying receivership would outweigh injury to the defendant; (6) whether the plaintiff has shown probable success in the action; and (7) whether the plaintiff's interests will in fact be well-served by a receivership. *Canada Life Assur. Co. v. LaPeter*, 563 F.3d 837, 844 (9th Cir. 2009).

Here, all of these factors weigh in favor of appointing a receiver over Defendants.  Woods is the architect of the Ponzi scheme, Southport is intimately involved in the scheme, and Horizon III is the investment vehicle through which the scheme was carried out.  In addition, the majority of Southport's other owners, including Woods's brother and cousin, are involved in the scheme along with several other advisers at the firm; and even support staff at the firm have facilitated this longstanding fraud.  In these circumstances, the appointment of a receiver over the Defendants is necessary.  *Torchia*, 183 F. Supp. 3d at 1322-23.

### C.    Asset Freeze

"Once the equity jurisdiction of the district court properly has been invoked, the court has power to order all equitable relief necessary under the circumstances, including the impoundment of assets."  *Smith v. S.E.C.*, 653 F.3d 121, 127-28 (2d. Cir. 2011) (internal quotation marks omitted); *Torchia*, 183 F. Supp. 3d at 1324. The purpose of an asset freeze is "to ensure that any funds that may become due can be collected" and to "preserve the status quo."  *S.E.C. v. Unifund SAL*, 910

F.2d 1028, 1041 (2d Cir.1990).  The SEC merely has to show that it is likely to succeed on the merits or that the defendants violated the law.  *Id.*

In this case, the SEC is likely to prevail on the merits and there is significant evidence that the Defendants violated the securities laws.  As described above, the Defendants offered and sold fraudulent investments in Horizon III to hundreds of investors in more than twenty states.  In stark contrast to what investors were told, Woods and the other defendants used investor funds to pay business expenses and to repay other investors in Horizon III.  In these circumstances, the Court should freeze the Defendants' assets to ensure that there are sufficient funds to satisfy a disgorgement award.  *Manor Nursing*, 458 F.2d at 1103.

### D.    Accounting

The Court also has the power to order the Defendants to provide an accounting of their assets and the investments in Horizon III.  *Manor Nursing*, 458 F.2d at 1105; *S.E.C. v. Lybrand*, 2000 WL 913894, at *12 (S.D.N.Y. July 6, 2000).  Specifically, the Court should order the Defendants to:  (i) identify the name, address, and phone number of each investor in Horizon III since 2008; (ii) identify the amount each investor invested in Horizon III and the date each investment was made; (iii) explain how each investor's funds were used and where the funds are now; and (iv) identify all of the Defendants' assets. *Lybrand*, 2000 WL 913894, at *12.

**E.      Expedited Discovery and an Order Prohibiting
         Destruction or Concealment of Documents**

The Commission requests that the Court grant expedited discovery in this

matter.  Such an order is necessary for the Commission to take meaningful discovery

in the period between the entry of a temporary restraining order and a hearing on the

SEC's application for a preliminary injunction.  *See* Fed. R. Civ. P. 65(b).  An order

prohibiting the destruction of evidence is also necessary given Woods's history of

lying to the SEC, and the evidence that Southport administrative personnel have

shredded documents related to Horizon III in the past.  (Goldstein Decl. ¶¶ 4, 8.)

<u>**CONCLUSION**</u>

For the foregoing reasons, the SEC respectfully requests that the Court issue a

temporary restraining order, an order requiring the Defendants to show cause why a

preliminary injunction should not be entered, and the other relief described above.


Dated: August 20, 2021          Respectfully submitted,

                                /s/ Harry B. Roback
                                M. Graham Loomis (GA Bar No. 457868)
                                Joshua A. Mayes (GA Bar No. 143107)
                                Harry B. Roback (GA Bar No. 706790)
                                U.S. Securities and Exchange Commission
                                950 East Paces Ferry Road, NE, Suite 900
                                Atlanta, GA 30326
                                Tel: (404) 942-0690
                                Facsimile:  (404) 842-7679

RobackH@sec.gov

Attorneys for Plaintiff

## **CERTIFICATION OF COMPLIANCE**

This is to certify that the foregoing was prepared using Times New Roman 14 point font in accordance with Local Rule 5.1 (B).

<u>/s/ Harry B. Roback</u>
Harry B. Roback